```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

LEON J. FORTIER, SR.,                  :

                   Plaintiff,          :
                                            09 Civ. 993 (RJS)(HBP)
     -against-                         :
                                            REPORT AND
MICHAEL J. ASTRUE,                     :    RECOMMENDATION
Commissioner of Social Security,
                                       :
                   Defendant.          :
----------------------------------X
```

PITMAN, United States Magistrate Judge:

TO THE HONORABLE RICHARD J. SULLIVAN, United States District Judge,

I.   Introduction

Plaintiff, Leon J. Fortier, Sr., brings this action, pro se, pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB").  Both plaintiff and defendant have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (Docket Items 8 and 12).  For the reasons set forth below, I respectfully recommend that judgment on the pleadings be granted in favor of defendant.

II.   Facts

   A.   Procedural Background

          Plaintiff filed an application for DIB pursuant to 42
U.S.C. § 423(b) on January 23, 2006, alleging that he had been
disabled since November 30, 2005 (Tr. 85).[1]  He stated that he
has depression, Post-Traumatic Stress Disorder and a substance
abuse problem, all of which he alleges stem from the September
11, 2001 attacks (Tr. 100, 102-03).  The Social Security Adminis-
tration denied plaintiff's application for benefits on July 19,
2006 (Tr. 13, 77).  Plaintiff timely requested and was granted a
hearing before an Administrative Law Judge ("ALJ") (Tr. 13, 54-
56, 75).  The ALJ, Brian W. Lemoine, conducted a hearing on
November 26, 2007 (Tr. 13) at which plaintiff was represented by
Jack Vega, a non-attorney representative from the Legal Aid
Society of Rockland County, Inc. (Tr. 13, 23-24, 51).  A voca-
tional expert, Pat Green, was also present at the hearing (Tr.
13, 23-24).  In a decision issued on June 11, 2008, the ALJ found
that plaintiff was not disabled from November 30, 2005 through
June 11, 2008 (Tr. 13-19).  Plaintiff requested review of the
decision on September 30, 2008 (Tr. 7-8), and the ALJ's determi-
nation became the final decision of the Commissioner on November

_____

          [1]"Tr." refers to the administrative record that defendant
filed as part of his answer, as required by 42 U.S.C. § 405(g).

2

17, 2008, when the Appeals Council denied plaintiff's request for review (Tr. 3).

On December 30, 2008, plaintiff commenced the instant pro se action seeking judicial review of the ALJ's decision (Compl. at 3).  Plaintiff stated in the complaint that he was entitled to DIB because of "P.T.S.D." (Post-Traumatic Stress Disorder), depression, "COPD" (presumably, chronic obstructive pulmonary disease), heart disease, "[g]allbladder," "pancreas" and hearing loss[2] (Compl. ¶ 4).  On June 9, 2009, plaintiff moved for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure (Plaintiff's Notice of Motion, dated June 9, 2009, Docket Item 8 ("Pl.'s Notice of Mot.")).  On October 5, 2009, defendant cross-moved for judgment on the pleadings under Rule 12(c) (Defendant's Notice of Motion, dated October 5, Docket Item 12).

In plaintiff's submissions in support of his motion and in opposition to defendant's cross-motion, he does not contend that the ALJ erred in any specific way, but rather emphasizes his symptoms, his difficulty working, and that he had worked hard

---

[2]Although plaintiff alleges both mental and physical disabilities in his complaint, his application for DIB was for alleged mental disabilities only (Tr. 100, 102-03; see Tr. 34) and the Commissioner made no finding with regard to any physical disability (see Tr. 13-19).  Because an action under Section 405 is an action to review the Commissioner's decision on plaintiff's application to the Social Security Administration, plaintiff's allegations of physical disability are immaterial here.

until the onset of his mental conditions (Plaintiff's Affirmation in Support of Motion, dated June 9, 2009 ("Pl.'s Aff. in Support") at 1-3; Letter from plaintiff to the undersigned, dated October 6, 2009, included in the submission being treated as Plaintiff's Affidavit in Opposition ("10/6/09 Fortier Letter") at 1).  Defendant argues in support of his motion that the ALJ's decision should be upheld because it was supported by substantial evidence and did not contravene any applicable laws or regulations (Memorandum of Law in Support of the Commissioner's Cross-Motion for Judgment on the Pleadings ("Def's. Mem. in Support") at 1; Answer ¶ 12).

In his submission in support of the motion, plaintiff submitted evidence that was not part of the original administrative record (Plainttiff's Aff. in Support, attachments, all attached to Pl.'s Notice of Mot.; see Endorsed Letter from John E. Gura, Esq., to the undersigned, dated July 13, 2009 and endorsed July 16, 2009; Endorsed Letter from John E. Gura, Esq., to the undersigned, dated August 13, 2009 and endorsed August 19, 2009; Endorsed Letter from John E. Gura, Esq., to the undersigned, dated September 14, 2009 and endorsed September 18, 2009).  On October 21, 2009, plaintiff submitted a document to the Office of the Pro Se Clerk entitled "Notice of Motion to Amend the Complaint," seeking to add further evidence ("Notice of Motion to Amend the Complaint," dated October 21, 2009, Docket

Item 19, now entitled "Affirmation in Opposition to Deft. Motion to Dismiss," Docket Item 16 ("Pl.'s Aff. in Opp."); see Order, issued November 17, 2009 ("11/17/09 Order")).  Several of the documents plaintiff seeks to add post-date the complaint (Pl.'s Aff. in Opp., attachments; see 11/17/09 Order).  The submission also includes a letter from plaintiff to the undersigned describing some of the details of his situation and dated October 6, 2009 (10/6/09 Fortier Letter).  On November 19, 2009, I entered an order directing the Clerk of the of Court to file this "motion" as a supplement to plaintiff's opposition to defendant's motion for judgment on the pleadings (11/17/09 Order).  My Order did not express any opinion on the propriety of considering this new evidence for any purpose (11/17/09 Order).

    B.  Plaintiff's Social
       Background

     Plaintiff was born on March 14, 1955 (Tr. 49).  He attended school through either 10th or 11th grade and does not have a GED (Tr. 35-36, 107, 122).  Plaintiff has four adult children (Tr. 33, 36) and, at the time of the ALJ's hearing on November 26, 2007, was in the process of getting a divorce (Tr. 28).  On April 21, 2006, Leslie Helprin, an examining psychologist, reported that plaintiff was living with his parents (Tr. 159), but plaintiff stated on November 26, 2007 that he was living alone in a rented trailer (Tr. 33-34).  Plaintiff's only

sources of income are public assistance from the Department of
Social Services, which he states pays his rent, and some contri-
butions from his parents (Tr. 34, 36).  Plaintiff is covered by
Medicaid (Tr. 34).

Plaintiff started working at the age of 14 (Tr. 27).
Most recently, and for the fifteen years preceding his applica-
tion for DIB, plaintiff worked as a construction supervisor for
$2 to $3 million construction projects in Manhattan (Tr. 26-27,
31).  The job involved scheduling the work on the projects,
tracking the work of the various trades involved and making sure
the projects were completed on time (Tr. 27).  Plaintiff super-
vised between ten and fifty people at various times (Tr. 104).
In addition to oversight and supervision, plaintiff's job in-
volved some physical labor (Tr. 104).  In the fifteen years
before he applied for DIB, plaintiff worked for JMK Construction,
Micron, and, finally, Federation Development, where he was
working on September 11, 2001 (Tr. 33).  Plaintiff lost his job
shortly after the 9/11 attacks, as many of the construction
projects he had been assigned to were in lower Manhattan (Tr.
26).  Plaintiff stated that between 2000 and 2002, he worked
sporadically as a self-employed contractor, doing carpentry work
for a New York City law firm (Tr. 32-33), but also reported that
he was out of work for a year after losing his job at Federation

6

Development (Tr. 103).[3]  Plaintiff started working as a construc-
tion supervisor again in 2004, but stated that he could not
attend work consistently or function properly at work (Tr. 26-
27).  Plaintiff testified that the last day he worked was in
November 2005[4] (Tr. 28).

     C.   Plaintiff's Medical
        Background[5]

       1.  Treating Physicians

     Dr. Jay Lombard, a neurologist, began treating plain-
tiff at the Brain Behavior Center on either January 18, 2002 or
January 18, 2003[6] (Tr. 150).  Dr. Lombard completed a question-

---

    [3]In addition, plaintiff stated on his initial application
for DIB and in his Disability Report that for a couple of years
between 2001 and 2004 he was selling furniture on commission as a
side business (Tr. 87, 103).

    [4]However, in a discharge summary corresponding to
plaintiff's admission for detoxification at Good Samaritan
Hospital and dated July 3, 2006, Dr. Mahomed Bhana stated that
one of the reasons plaintiff gave for leaving the hospital was
"to return to his work" (Tr. 172).

    [5]This section summarizes the evidence contained in the
administrative record that was before the ALJ; the new
information plaintiff submitted is addressed in subsection II.E
below.

    [6]Dr. Lombard's response to "date first seen" in the
questionnaire looks somewhat more like "1/18/02" than "1/18/03"
(see Tr. 150), but both the memorandum of law plaintiff submitted
to the ALJ in advance of the hearing and defendant's memorandum
of law in support of his motion report this date as 2003 (Tr.
123; Def.'s Mem. in Support at 5).

naire for the New York State Office of Temporary and Disability
Assistance on June 29, 2006 (Tr. 150-56).  He reported a treating
diagnosis of polysubstance abuse (Tr. 150) and listed plaintiff's
presenting problems as crack abuse, alcoholism and depression
(Tr. 152).  He indicated "poor compliance" in the section on
"treatment and response" (Tr. 151) and indicated that the ex-
pected duration of plaintiff's condition was "lifelong" (Tr.
151).  Dr. Lombard commented that plaintiff's "attitude, appear-
ance [and] behavior" was "distracted" and that plaintiff had poor
insight and pressured speech (Tr. 153).  He indicated that
plaintiff had made a suicide attempt in the form of substance
overdose on July 3, but the year is illegible[7] (Tr. 154).  He
also indicated that plaintiff was "currently hospitalized at
Nyack Hospital" as the result of an overdose (Tr. 152); it is
unclear whether these two notations refer to the same event.

        Dr. Lombard stated that plaintiff had no limitation in
understanding and memory (Tr. 155), but that his depression
limited his sustained concentration and persistence, which the
form describes as the ability to "follow simple or detailed
instructions, follow schedules, work with others, follow a
reasonable pace, sustain ordinary routine without supervision,

---

        [7]The ALJ's decision states that Dr. Lombard's report notes a
suicide attempt in July 2006 (Tr. 17), but it appears that Dr.
Lombard was referring to a different event, as he completed the
form on June 29, 2006.

maintain customary attendance and punctuality, etc." (Tr. 155).
Dr. Lombard also stated that plaintiff's significant substance
abuse caused limitations in his social interaction, which the
form describes as the ability to "interact with the public, ask
simple questions, accept supervisory instructions, get along
appropriately with co-workers, adhere to basic neatness and
cleanliness etc." (Tr. 155).  He also indicated that plaintiff
was limited in his adaption ability, which the form describes as
the ability to "respond appropriately to changes in the work
setting, be aware of hazards, travel/use public transportation,
set realistic goals, make plans independently, etc.," but his
notation as to the reason for this limitation is illegible (Tr.
155).  Dr. Lombard stated that plaintiff's ability to perform the
activities of daily living was within normal limits (Tr. 154).

     Dr. Lombard opined that plaintiff's ability to do work-
related mental activities was affected by the "significant mental
disabilities" of "polysubstance abuse [and] major depression"
(Tr. 154).

     Dr. Lawrence Levitt, a psychiatrist, began treating
plaintiff at Good Samaritan Hospital's Frawley Clinic on November
5, 2007 (Tr. 27, 30).  Dr. Levitt completed a Functional Capacity
Questionnaire for Psychiatric Disorders for the Social Security
Administration on April 23, 2008 (Tr. 176-81).  In the question-
naire Dr. Levitt noted that he had weekly contact with plaintiff

for psychotherapy and monthly contact for maintenance of plain-
tiff's medications (Tr. 176).  His diagnoses included recurrent
major depression, alcohol dependence in remission and personality
disorder "NOS" (i.e., not otherwise specified) (Tr. 176).  Dr.
Levitt noted that plaintiff had demonstrated a positive response
to counseling sessions but gave plaintiff a prognosis of "guarde-
d" (Tr. 177).  The symptoms reported by Dr. Levitt were a history
of alcoholism and substance abuse, sleep disturbance, severe
depression, OCD (obsessive compulsive disorder) symptoms such as
compulsive cleaning, an emotionally charged affect ("on occasion
bursts into tears"), poor appetite and some increase in
psychomotor activity (Tr. 176).  Dr. Levitt reported that plain-
tiff was taking Trazodone and Paxil, and that he had tried
Effexor but it had caused some side effects (Tr. 177).

          Dr. Levitt opined that plaintiff had a mild limitation[8]
in the activities of daily living, a moderate limitation in
maintaining social functioning, a marked limitation in concentra-
tion, persistence or pace resulting in failure to complete tasks
in a timely manner and that plaintiff has experienced one or two
episodes of deterioration or decompensation that cause him to

_____

          [8]The form defines a "mild" impairment as "one which has a
slight effect on the ability to function," a "moderate"
impairment as "one which affects, but does not preclude, the
ability to function," a "marked" impairment as one that
"seriously affects the ability to function," and an "extreme"
impairment as one that "precludes the ability to function" (Tr.
179).

withdraw from the situation or experience an exacerbation of signs and symptoms (Tr. 178-80).

Dr. Levitt also opined that in a work setting on a regular and continuous basis, plaintiff would have a moderate limitation in his ability to understand, remember and carry out instructions; that plaintiff would have mild limitations in his abilities to respond appropriately to supervision and coworkers; that plaintiff would have a marked limitation in his ability to satisfy an employer's normal quality, production and attendance standards; that plaintiff would have a moderate limitation in his ability to respond to customary work pressures; that plaintiff would have a marked limitation in his ability to perform complex tasks on a sustained basis in a full-time work setting and that plaintiff would have a mild limitation in his ability to perform simple tasks on a continued basis in a full-time work setting (Tr. 180-81).

Dr. Levitt opined that as of the time of the evaluation, plaintiff could not sustain his former work activity and noted further that his concentration was impaired, he attended Alcoholics Anonymous ("AA") meetings one or two times daily, and that he was still vulnerable to relapse (Tr. 181).

2.   Hospital Admissions

Plaintiff states that he was admitted to Good Samaritan Hospital in Suffern, New York from December 3, 2005 through January 2, 2006 as the result of an anxiety attack, and received therapy and medication (Tr. 105-06).

The record also contains documents reflecting plain- tiff's admission to the Emergency Department at Good Samaritan Hospital on July 3, 2006 (Tr. 165).  The documents state that plaintiff arrived as a walk-in requesting alcohol detoxification (Tr. 168), that plaintiff had been discharged earlier that same day from six days of detox, that he drank several beers in an effort to get readmitted to detox and that (although the time period referred to was unclear) he "repeatedly went out and smoked crack cocaine, his drug of choice" (Tr. 166).  The records for this admission indicate a final diagnosis of alcohol intoxi- cation (Tr. 165).  The rest of the notes are largely illegible, but the author appears to have determined that there were no beds available for detox and told plaintiff to call on July 5, 2006 (Tr. 166).  The notes indicate that plaintiff was discharged on July 3, 2006 (Tr. 166).

A discharge summary, written by Dr. Mahomed Bhana, the attending physician, states that plaintiff

> was initially admitted to our detox unit with a history of drinking 18 Bacardi's a day for the last 12 months and spending a lot of money on cocaine and crack.

> . . . After patient completed detox, he was admitted to
> our rehab unit.  The patient reported that he had been
> depressed and had lost interest in his work and also
> had to move in at his parents home where he had to
> sleep in the basement and the place was a mess.  The
> patient was started on Wellbutrin XL 150 mg a day while
> he was in rehab, as well as Zyprexa 5 mg a day, which
> he claims help his anxiety.

(Tr. 171).  Dr. Bhana's discharge summary also notes that plain-

tiff has "a history of using alcohol since age 12 and crack since

age 47" (Tr. 171).  It stated that plaintiff had been admitted to

Good Samaritan twice, first from December 2005 to January 2006[9]

and then four months later after a relapse (Tr. 171).  Dr.

Bhana's diagnoses included alcohol and cocaine dependence as well

as major depression (Tr. 171).  He stated that plaintiff "denies

any suicidal or homicidal ideations" (Tr. 171).  Dr. Bhana noted

that plaintiff "stayed only 1 day in rehab and insisted on

leaving the hospital as he had to see the dentist and to see his

son who is in jail and to return to his work. . . . [Plaintiff]

left the unit against clinical advice" (Tr. 172).


3.  <u>Consultative Physicians</u>

     Dr. Leslie Helprin of Industrial Medicine Associates in

New City, New York performed a consultative psychiatric evalua-

tion of plaintiff on April 21, 2006 (Tr. 159).  Dr. Helprin

---

     [9]This appears to be the same time period during which
plaintiff states he was admitted to Good Samaritan because of an
anxiety attack (Tr. 105-06).

reported the following findings.  Plaintiff participated in marital counseling with a private psychologist for six or seven months around 1991 (Tr. 159) and, as of the time of the evalua- tion, was seeing Dr. Jay Lombard, who prescribed Zyprexa and had prescribed Zoloft in the past (Tr. 159).  Plaintiff slept and ate well but was fatigued and felt "mellow" (Tr. 159).  He denied any suicidal thoughts or attempts (Tr. 159).  Plaintiff was affected by anxiety, experienced heart palpitations and had several thoughts at once (i.e., he did not know "whether to put on [his] shoes or take a shower or brush [his] teeth or smoke or have coffee") (Tr. 159-60).  Plaintiff reported difficulty in thinking and stated that this caused things to take longer (Tr. 160). Plaintiff denied any drug or alcohol use at the time of the evaluation, but had attended AA meetings in the past and was once told by his marital counselor that he was a "weekend alcoholic" (Tr. 160).  Plaintiff indicated that several other members of his family were alcoholics as well (Tr. 160).

Plaintiff told Dr. Helprin that he stopped working because of problems concentrating and the fact that his thinking was "'not right'" (Tr. 159).

Dr. Helprin found plaintiff cooperative during the evaluation and described "[h]is manner of relating, social skills, and overall presentation" as "adequate" (Tr. 160).  Dr. Helprin found that plaintiff's appearance was normal; that his

14

speech was fluent and clear but "with word finding difficulties and limited receptive language skills"; that his thought processes were "[c]oherent and goal directed with no evidence of hallucinations, delusions, or paranoia"; that his affect was "[o]f full range and appropriate in speech and thought content"; that his mood was "[e]uthymic[10] and smiling"; that his attention and concentration were "mildly impaired due to limited intellectual functioning"; that his memory skills were "mildly impaired due to limited intellectual functioning and nervousness"; and that his cognitive functioning was characterized by "intellectual skills in the low average range and [a] limited general fund of information" (Tr. 160-61).

Dr. Helprin noted that although plaintiff was able to dress, bathe and groom himself, his parents assisted him with cooking, cleaning, laundry, shopping and money management (Tr. 161).  He also stated that plaintiff was able to drive and attended AA meetings (Tr. 161).  Plaintiff reported claustrophobic feelings when in crowds, such as when using public transportation (Tr. 161).  In terms of vocational skills, Dr. Helprin found that plaintiff was "able to follow and understand simple directions and instructions and perform simple rote tasks, but not complex tasks due to cognitive limitations and nervousness,"

---

[10]Euthymia is "[m]oderation of mood, not manic or depressed."  Stedman's Medical Dictionary (27th ed. 2000).

and that he was "able to maintain sufficient attention and
concentration [if] provided [with] specific task instructions"
(Tr. 161-62).  Dr. Helprin also opined that plaintiff was "able
to make appropriate decisions, relate adequately with others, and
deal appropriately with stressors with current treatment" (Tr.
162).  Overall, the examination results were "consistent with
psychiatric difficulties, but with current treatment, this d[id]
not appear [to Dr. Helprin] to be significant enough to interfere
with [plaintiff's] ability to function on a daily basis" (Tr.
162).  Dr. Helprin noted diagnoses of agoraphobia, alcohol abuse
in full sustained remission, hypertension and hypothyroidism,
potential "depressive disorder, NOS [(not otherwise specified)]
(currently controlled with medication)," and potential borderline
intellectual functioning (Tr. 162).  Dr. Helprin's recommenda-
tions were that plaintiff continue with his current psychiatric
treatment and "undergo vocational retraining for a job commensu-
rate with his skills and simple tasks with specific procedural
instructions, not in a supervisory capacity" (Tr. 162).

          Dr. Abdul Hameed, a state agency medical consultant,
completed the Psychiatric Review Technique form for the Social
Security Administration on July 13, 2006 (Tr. 130-44; see Def.'s
Mem. in Support at 7).  He reported positive findings for the
categories of affective disorders, anxiety-related disorders and
substance addiction disorders and indicated that a residual

16

functional capacity assessment was necessary (Tr. 130).  Under
the section of the form corresponding to the paragraph B criteria
of the listings for plaintiff's impairments, found in Section
12.04 of 20 C.F.R. Part 404, Subpart P, Appendix 1, Dr. Hameed
found that plaintiff had no restriction in activities of daily
living, mild difficulties in maintaining social functioning and
moderate difficulties in maintaining concentration, persistence
or pace (Tr. 140).  He found further that plaintiff had experi-
enced one or two repeated episodes of deterioration (Tr. 140).
Dr. Hameed also found that the evidence did not establish the
existence of the criteria in paragraph C of the listings (Tr.
141).

          In conjunction with the Psychiatric Review Technique
form, Dr. Hameed completed a Mental Residual Functional Capacity
Assessment for plaintiff dated July 13, 2006 (Tr. 144).  Dr.
Hameed found that plaintiff's only significant limitations were
moderate limitations in his abilities to respond appropriately to
changes in the work setting and to set realistic goals or make
plans independently of others (Tr. 145).  Specifically, Dr.
Hameed opined that plaintiff had no significant limitation in his
ability to do any of the following:

--    "complete a normal workday and workweek without interrup-
      tions from psychologically based symptoms [or] to perform at

17

a consistent pace without an unreasonable number and length of rest periods"

-- "interact appropriately with the general public"

-- "ask simple questions or request assistance"

-- "accept instructions and respond appropriately to criticism from supervisors"

-- "get along with coworkers or peers without distracting them or exhibiting behavioral extremes"

-- "maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness"

-- "be aware of normal hazards and take appropriate precautions"

-- "travel in unfamiliar places or use public transportation" (Tr. 145). Dr. Hameed stated at the end of the assessment that "based [on] objective findings it is reasonable to believe that [plaintiff] retains the capacity to handle the stressor of a work/job in work setting on a consistent basis" (Tr. 146).

### 4.  Medications

When plaintiff applied for DIB on January 23, 2006, he reported that he was taking Seroquel for depression, Zoloft for compulsive behavior, Lopressa for hypertension and Protonix for stomach issues (Tr. 106). Other parts of the record indicate that plaintiff had, at different times, been on Zyprexa for

anxiety (Tr. 159, 171), Lithium for "bipolar" (Tr. 115),
Wellbutrin (Tr. 171), Effexor for depression and PTSD (Tr. 29,
121), Adderall (Tr. 27), and Trazodone and Paxil for depression
(Tr. 177).

     D.  Proceedings Before
       the ALJ

       1.  Plaintiff's Testimony

At the administrative hearing on November 26, 2007,
plaintiff testified to the following facts.  Plaintiff has been
diagnosed with Post-Traumatic Stress Disorder and depression (Tr.
25).  He was treated by Dr. Lombard for his depression, starting
shortly after he lost his job as the result of the September 11,
2001 attacks and continuing at least through November 2005, when
he stopped working for the second time (Tr. 25-27, 29).  At the
time of the hearing plaintiff was no longer seeing Dr. Lombard
because he did not take plaintiff's insurance, but plaintiff had
started seeing Dr. Levitt at Good Samaritan Hospital on November
5, 2007 (Tr. 27, 29-30).  Plaintiff had tried several anti-
depressants, including Zoloft and Adderall, but stated that
nothing seemed to work for more than a short period of time (Tr.
27, 29).  At the time of the hearing he was taking Effexor (Tr.
29).

At some point after September 11, 2001, plaintiff started drinking heavily, although he was not drinking at the time he returned to work in 2004 (Tr. 25, 27). After he stopped working again in November 2005, he would sporadically resume drinking (Tr. 29). Plaintiff entered rehabilitation for substance abuse four times, for the first time in 2005 and most recently for 17 days starting in July or August 2006 (Tr. 27, 36-37). He has not used alcohol since August 1, 2006 and attends an AA meeting every day (Tr. 27, 36-37).

After losing his job in 2001, plaintiff started working again in 2004 (Tr. 26). However, he would miss days, fail to complete his duties, and generally "could not function" at work (Tr. 26). When he attempted to return to work in 2004, his "thinking was completely off" (Tr. 27).

He felt generally unable to function normally (Tr. 30-31). He had trouble getting up and would sometimes get up for half an hour but could not function after that (Tr. 30-31). The only thing he wanted to do every day was attend his AA meeting (Tr. 30). There had been some change (although he did not specifically say whether negative or positive) in his condition since he started seeing Dr. Levitt, but his symptoms fluctuated (Tr. 38). Plaintiff did not have any physical conditions that interfered with his ability to work; his symptoms were completely mental (Tr. 34). Plaintiff was able to drive and sometimes drove

20

himself to his AA meetings, though his mother helped him with grocery shopping (Tr. 34-36).  He also went to her house for meals (Tr. 36).

2.  Expert Testimony

The Commissioner called Pat Green to testify as a vocational expert.  Green stated that, according to the Dictionary of Occupational Titles, the job of construction project manager is skilled work (Tr. 39).  She testified that a hypothetical person of plaintiff's age, education and work history, with no exertional limits, but limited to the performance of simple routine, repetitive tasks, would not be able to do any of plaintiff's past relevant work (Tr. 41).  She stated, however, that there were other jobs in the regional and national economies that such a person could perform, giving as examples the positions of garment sorter (unskilled at a light level), industrial cleaner (unskilled at a medium level) and kitchen helper (unskilled at a medium level) (Tr. 41).  She testified that the additional limitation of being unable to interact with the public or co-workers more than occasionally would preclude the kitchen helper position, but the garment sorter and industrial cleaner positions would still be possible (Tr. 42).  She also testified that if the hypothetical person experienced frequent lapses in concentration that would put them

21

off-task, they would not be able to sustain work in these
positions (Tr. 42).

     E.  <u>New Evidence</u>

        All of the evidence discussed above was contained in
the administrative record used by the Commissioner in his
determination on plaintiff's application for DIB.  Plaintiff also
submits new evidence which was not contained in the
administrative record.

        Attached to plaintiff's affidavit in support of his
motion are:  (1) two documents entitled "Medical Examination for
Employability Assessment, Disability Screening, and
Alcoholism/Drug Addiction Determination," completed by Dr.
Lawrence Levitt and dated September 17, 2008 and March 11, 2009,
respectively, (2) several medical records that pertain only or
primarily to plaintiff's physical health, (3) several "patient
information records," none of which contain any substantive
information, (4) documents corresponding to an admission to Nyack
Hospital Addiction Services on July 10, 2006, (5) documents
corresponding to an admission to Nyack Hospital Addiction
Services on August 2, 2006, (6) the Social Security
Administration form plaintiff completed regarding his
medications, and (7) the Social Security Administration form
plaintiff completed regarding his work background.

Attached to plaintiff's "motion to amend the complaint," which I treated as a supplement to his opposition to defendant's cross-motion, are two letters from Dr. Levitt, copies of 9/11 Mental Health Benefit Program cards for plaintiff and his family and an Attending Doctor's Report and Carrier/Employer Billing Form completed by Dr. Harold H. Fogelman for the New York Workers' Compensation Board.

III.  Analysis

    A.  Applicable Legal
        Principles

       1.  Standard of Review

The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon an erroneous legal standard.  42 U.S.C. § 405(g); Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Bubnis v. Apfel, 150 F.3d 177, 181 (2d Cir. 1998).  The term "substantial evidence" has been defined as "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996), quoting Richardson v. Perales, 402 U.S. 389, 401 (1971); accord

23

Burgess v. Astrue, supra, 537 F.3d at 127-28; Halloran v.
Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); Veino v. Barnhart,
supra, 312 F.3d at 586; Tejada v. Apfel, supra, 167 F.3d at 773-
74; Quinones ex rel. Quinones v. Chater, 117 F.3d 29, 33 (2d Cir.
1997).

> The reviewing court does not conduct a de novo review
> as to whether the claimant is disabled, Parker v.
> Harris, 626 F.2d 225, 231 (2d Cir. 1980), nor may it
> substitute its own judgment for that of the
> Commissioner.  Jones v. Sullivan, 949 F.2d 57, 59 (2d
> Cir. 1991); Valente v. Sec'y of Health & Human Servs.,
> 733 F.2d 1037, 1041 (2d Cir. 1984).  When the Commis-
> sioner's decision is not supported by substantial
> evidence, a reviewing court must reverse the
> administrative decision because "the entire thrust of
> judicial review under the disability benefits law is to
> insure a just and rational result between the
> government and a claimant . . . ."  Williams ex rel.
> Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988).

Lee v. Apfel, CV 99-2930 (LDW), 2000 WL 356411 at *2 (E.D.N.Y.
Apr. 3, 2000); see Veino v. Barnhart, supra, 312 F.3d at 586
("Where the Commissioner's decision rests on adequate findings
supported by evidence having rational probative force, we will
not substitute our judgment for that of the Commissioner.").
Moreover, the Commissioner's decision must be affirmed if it is
supported by substantial evidence, even if there is also
substantial evidence supporting plaintiff's position.  Persico v.
Barnhart, 420 F. Supp. 2d 62, 71 (E.D.N.Y. 2006), citing Jones v.
Sullivan, 949 F.2d 57, 59-60 (2d Cir. 1991).

"Reversal and entry of judgment for the claimant is
appropriate only 'when the record provides persuasive proof of

disability and a remand for further evidentiary proceedings would serve no purpose.'" Cruz ex rel. Vega v. Barnhart, 04 Civ. 9794 (DLC), 2005 WL 2010152 at *8 (S.D.N.Y. Aug. 23, 2005) (Cote, D.J.), modified on other grounds on reconsideration, 2006 WL 547681 (S.D.N.Y. Mar. 7, 2006), quoting Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980); accord Rivera v. Sullivan, 923 F.2d 964, 970 (2d Cir. 1991); Babcock v. Barnhart, 412 F. Supp. 2d 274, 284 (W.D.N.Y. 2006); Buonviaggio v. Barnhart, 04 Civ. 357 (JG), 2005 WL 3388606 at *5 (E.D.N.Y. Dec. 2, 2005); Rivera v. Barnhart, 379 F. Supp. 2d 599, 604 (S.D.N.Y. 2005) (Marrero, D.J.); see 42 U.S.C. § 405(g) ("The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.").

      2.  Determination of
         Disability

      Under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., a claimant is entitled to disability benefits if he or she can establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see also Barnhart v.

Walton, 535 U.S. 212, 217-22 (2002) (both impairment and

inability to work must last twelve months).  The impairment must

be demonstrated by "medically acceptable clinical and laboratory

diagnostic techniques," 42 U.S.C. § 423(d)(3), and it must be

> of such severity that [the claimant] is not only unable
> to do his previous work but cannot, considering [the
> claimant's] age, education, and work experience, engage
> in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether
> such work exists in the immediate area in which [the
> claimant] lives, or whether a specific job vacancy
> exists for [the claimant], or whether [the claimant]
> would be hired if [the claimant] applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  In addition, to

obtain disability benefits, the claimant's disability must have

commenced prior to the expiration of his or her insured status.

20 C.F.R. §§ 404.130, 404.315.

The Commissioner must consider both objective and

subjective factors when assessing a disability claim, including:

(1) objective medical facts and clinical findings; (2) diagnoses

and medical opinions of examining physicians; (3) subjective

evidence of pain and disability to which the claimant and family

or others testify; and (4) the claimant's educational background,

age and work experience.  Brown v. Apfel, 174 F.3d 59, 62 (2d

Cir. 1999); Rivera v. Schweiker, 717 F.2d 719, 723 (2d Cir.

1983).

"In evaluating disability claims, the [Commissioner] is

required to use a five-step sequence, promulgated in 20 C.F.R.

26

§§ 404.1520, 416.920." Bush v. Shalala, 94 F.3d 40, 44 (2d Cir. 1996).

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where . . . the claimant is not so engaged, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to do basic work activities. . . . Where the claimant does suffer a severe impairment, the third inquiry is whether, based solely on medical evidence, he has an impairment listed in Appendix 1 of the regulations or equal to an impairment listed there. . . . If a claimant has a listed impairment, the Commissioner considers him disabled. Where a claimant does not have a listed impairment, the fourth inquiry is whether, despite his severe impairment, the claimant has the residual functional capacity to perform his past work. . . . Finally, where the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); see also Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds on rehearing, 416 F.3d 101 (2d Cir. 2005); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Shaw v. Chater, supra, 221 F.3d at 132; Brown v. Apfel, supra, 174 F.3d at 62; Tejada v. Apfel, supra, 167 F.3d at 774; Rivera v. Schweiker, supra, 717 F.2d at 722.

Step four requires that the ALJ make a determination as to the claimant's residual functional capacity ("RFC"). Sobolewski v. Apfel, 985 F. Supp. 300, 309 (E.D.N.Y. 1997). RFC is defined in the applicable regulations as "the most [the

27

claimant] can still do despite [his] limitations."  20 C.F.R.
§§ 404.1545(a)(1), 416.945(a)(1).

        The claimant bears the initial burden of proving
disability with respect to the first four steps.  Burgess v.
Astrue, supra, 537 F.3d at 128; Green-Younger v. Barnhart, supra,
335 F.3d at 106; Balsamo v. Chater, supra, 142 F.3d at 80.  Once
the claimant has satisfied this burden, the burden shifts to the
Commissioner to prove the final step -- that the claimant's RFC
allows the claimant to perform some work other than the
claimant's past work.  Balsamo v. Chater, supra, 142 F.3d at 80;
Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986).

            In meeting [his] burden of proof on the fifth step
        of the sequential evaluation process described above,
        the Commissioner, under appropriate circumstances, may
        rely on the medical-vocational guidelines contained in
        20 C.F.R. Part 404, Subpart P, App. 2, commonly
        referred to as "the Grid."  The Grid takes into account
        the claimant's RFC in conjunction with the claimant's
        age, education and work experience.  Based on these
        factors, the Grid indicates whether the claimant can
        engage in any other substantial gainful work which
        exists in the national economy.

Gray v. Chater, 903 F. Supp. 293, 297-98 (N.D.N.Y. 1995) (Koeltl,
D.J.).  When a claimant retains the RFC to perform at least one
of the categories of work listed on the Grid, and when the
claimant's educational background and other characteristics are
also captured by the Grid, the ALJ may rely exclusively on the
Grid in order to determine whether the claimant retains the RFC
to perform some work other than his or her past work.  Butts v.

28

Barnhart, supra, 388 F.3d at 383 ("In the ordinary case, the
Commissioner meets his burden at the fifth step by resorting to
the applicable medical vocational guidelines (the [Grid]).").

However, "exclusive reliance on the [Grid] is
inappropriate" where non-exertional limitations significantly
limit a claimant's ability to work. Butts v. Barnhart, supra,
388 F.3d at 383, quoting Rosa v. Callahan, 168 F.3d 72, 78 (2d
Cir. 1999); Bapp v. Bowen, supra, 802 F.2d at 603. When a
claimant suffers from a non-exertional limitation such that he is
"unable to perform the full range of employment indicated by the
[Grid]," Bapp v. Bowen, supra, 802 F.2d at 603, the Commissioner
must introduce the testimony of a vocational expert in order to
prove "that jobs exist in the economy which the claimant can
obtain and perform." Butts v. Barnhart, supra, 388 F.3d at 383;
see 20 C.F.R. § 404.1569a(d), pt. 404, subpt. P, app. 2,
§ 200.00(e); see also Heckler v. Campbell, 461 U.S. 458, 462 n.5
(1983) ("If an individual's capabilities are not described
accurately by a rule, the regulations make clear that the
individual's particular limitations must be considered.").

When considering the evidence in the record, the ALJ is
required to give deference to the opinions of treating
physicians. Under the regulations' "treating physician rule," a
treating physician's opinion will be given controlling weight if
it is "well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the
other substantial evidence in . . . [the] record."  20 C.F.R.
§ 404.1527(d)(2); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir.
2000); Dias v. Shalala, 59 F.3d 307, 313 n.6 (2d Cir. 1995);
Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993).  Before
giving a treating physician's opinion less than controlling
weight, the ALJ must apply various factors to determine the
amount of weight the opinion should be given.  These factors
include:  (1) the length of the treatment relationship and the
frequency of examination; (2) the nature and extent of the
treatment relationship; (3) the medical support for of the
treating physician's opinion; (4) the consistency of the opinion
with the record as a whole; (5) the physician's level of
specialization in the area and (6) other factors that tend to
support or contradict the opinion.  20 C.F.R. § 404.1527(d)(2)-
(6); Schisler v. Sullivan, supra, 3 F.3d at 567; Mitchell v.
Astrue, 07 Civ. 285 (JSR), 2009 WL 3096717 at *16 (S.D.N.Y. Sept.
28, 2009) (Rakoff, D.J.) (adopting Report and Recommendation of
Freeman, M.J.); Matovic v. Chater, 94 Civ. 2296 (LMM), 1996 WL
11791 at *4 (S.D.N.Y. Jan 12. 1996) (McKenna, D.J.).  A "good
reason" must be given for declining to afford a treating
physician's opinion controlling weight.  20 C.F.R.
§ 404.1527(d)(2); Schisler v. Sullivan, supra, 3 F.3d at 570;

Burris v. Chater, 94 Civ. 8049 (SHS), 1996 WL 148345 at *6 n.3
(S.D.N.Y. Apr. 2, 1996) (Stein, D.J.).

          "If the ALJ finds that a claimant is disabled under the
Act, but the record contains evidence of substance abuse, the ALJ
must determine whether the claimant's drug addiction and/or
alcoholism is a contributing factor material to the determination
of disability." Mitchell v. Astrue, supra, 2009 WL 3096717 at
*15; see 20 C.F.R. § 404.1535. This analysis turns on whether
the claimant would still be found disabled were he to stop using
drugs and alcohol. 20 C.F.R. § 404.1535(b)(1); Mitchell v.
Astrue, supra, 2009 WL 3096717 at *15. "When the record reflects
drug or alcohol abuse, the claimant bears the burden of proving
that substance abuse is not a contributing factor material to the
disability determination." Eltayyeb v. Barnhart, 02 Civ. 925
(MBM), 2003 WL 22888801 at *4 (S.D.N.Y. Dec. 8, 2003) (Mukasey,
D.J.).

     B.  Evaluation of the
         ALJ's Decision[11]

          In his decision, the ALJ first noted that plaintiff met
the Social Security Act's insured status requirements through
December 31, 2009 (Tr. 15). The ALJ then applied the five-step

_____

          [11]Because plaintiff does not indicate in his submission that
he objects to any specific aspects of the ALJ's decision, I will
consider each of the steps in the ALJ's analysis that supported
the conclusion that plaintiff was not disabled.

analysis and determined that, based on the medical evidence and
plaintiff's testimony:  (1) plaintiff had not engaged in
substantial gainful activity since November 30, 2005, (2)
plaintiff had two severe impairments, depression and alcoholism[12]
and (3) although plaintiff suffered from severe impairments, they
did not, either singly or in combination, meet or medically equal
one of the listed impairments in 20 C.F.R. Part 404, Subpart P,
Appendix 1 (Tr. 14-16).

        The ALJ found that plaintiff's severe impairments did
not rise to the level of an impairment listed in or medically
equivalent to the listed impairments because plaintiff's
condition did not meet the criteria of paragraphs B or C of the
listings for plaintiff's impairments, found in Section 12.04 of
20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 15-16).  Section
12.04 addresses affective disorders, including depressive
syndrome, and contains criteria divided into paragraphs A, B and

---

        [12]As noted above, a claimant is not entitled to DIB if
alcoholism or drug addiction is a material contributing factor to
what would otherwise be a qualifying disability, 42 U.S.C.
§ 423(d)(2)(C); 20 C.F.R. § 404.1535, i.e., the claimant is not
entitled to DIB if he would no longer be disabled if he stopped
using drugs or alcohol, 20 C.F.R. § 404.1535(b)(1)-(2).  Because
the ALJ found plaintiff was not disabled, he did not reach this
inquiry.  In any event, plaintiff's substance addiction was
apparently in remission as of both the ALJ's hearing (November
26, 2007) and Dr. Levitt's evaluation (April 23, 2008) and
plaintiff claimed not to have used drugs or alcohol since August
2006 (Tr. 27, 37, 176).

C.[13]   20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04(A).   "The
required level of severity for these disorders is met when the
requirements in both A and B are satisfied, or when the
requirements in C are satisfied."   20 C.F.R. pt. 404, subpt. P,
app. 1, § 12.04.

Paragraph A is met when there is "medically documented
persistence" of either depressive syndrome or manic syndrome
characterized by certain symptoms or conditions defined in the
paragraph.   20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04(A).

To satisfy paragraph B, a claimant must show that his
condition results in at least two of:   "(1) [m]arked restriction
of activities of daily living; or (2) [m]arked difficulties in
maintaining social functioning; or (3) [m]arked difficulties in
maintaining concentration, persistence, or pace; or (4) [r]epeat-
ed episodes of decompensation, each of extended duration."   20
C.F.R. pt. 404, subpt. P, app. 1, § 12.04 (B).   The regulations
state that "marked" means "more than moderate but less than
extreme."   20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C).   An
episode of decompensation is an "exacerbation[] or temporary
increase[] in symptoms or signs accompanied by a loss of adaptive

---

[13]"Section 12.09 provides that the required severity for a
substance addiction disorder is met when, inter alia, the
requirements of section 12.04 are satisfied."   Mitchell v.
Astrue, supra, 2009 WL 3096717 at *12; see 20 C.F.R. pt. 404,
subpt. P, app. 1, § 12.09.

functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(4).  "The term repeated episodes of decompensation, each of extended duration . . . means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks."  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(4).

To satisfy paragraph C, a claimant must show "[m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support" as well as at least one of:  "(1) [r]epeated episodes of decompensation, each of extended duration; or (2) [a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) [c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement."  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04(C).

The ALJ did not explicitly address the criteria of paragraph A, apparently finding that plaintiff satisfied the

paragraph A requirements.  See Mitchell v. Astrue, supra, 2009 WL
3096717 at *12 n.6; Rivas v. Barnhart, 01 Civ. 3672 (RWS), 2005
WL 183139 at *21 (S.D.N.Y. Jan. 27, 2005) (Sweet, D.J.).
However, the ALJ found that plaintiff failed to meet either the
paragraph B criteria or the paragraph C criteria (Tr. 15-16).  In
reaching his determination that plaintiff did not satisfy
paragraph B, the ALJ stated:

> In activities of daily living, the claimant has a
> mild restriction.  In social functioning, the claimant
> has moderate difficulties.  With regard to
> concentration, persistence or pace, the claimant has
> moderate difficulties.  As for episodes of
> decompensation, the claimant has experienced 1 or 2
> episodes of decompensation.  Because the claimant's
> mental impairments do not cause at least two "marked"
> limitations or one "marked" limitation and "repeated"
> episodes of decompensation, the "paragraph B" criteria
> are not satisfied.

(Tr. 15-16).  The ALJ also stated that "the evidence fails to
establish the presence of the 'paragraph C' criteria" (Tr. 16).
He elaborated on the limitations set forth in paragraphs B and C
in his analysis of plaintiff's RFC, which, he stated, "requires a
more detailed assessment by itemizing various functions contained
in the broad categories found in paragraphs B and C" (Tr. 16).
Thus, the substance of the ALJ's reasoning behind his
determination regarding the paragraph B and C criteria is found
in his discussion of plaintiff's RFC.

The ALJ drew on substantial evidence in the record to
support his conclusion that plaintiff's condition failed to meet

the requirements of paragraph B.  His finding that plaintiff has
a mild restriction in daily living activities is supported by the
finding of Dr. Levitt,[14] plaintiff's treating physician[15] (Tr.
178).  It is also supported by other evidence in the record that
was noted by the ALJ (Tr. 17), namely Dr. Lombard's statement
that plaintiff's ability to perform daily living activities was
within normal limits (Tr. 154) and Dr. Helprin's statements that
plaintiff was able to groom himself, drive and attend meetings
(Tr. 161).  Further, although the ALJ did not mention this
portion of Dr. Helprin's report in his decision, the ALJ's
finding of a mild restriction in plaintiff's daily living
activities is consistent with Dr. Helprin's statement that
plaintiff's "psychiatric difficulties" are "not significant
enough to interfere with [plaintiff's] ability to function on a
daily basis" (Tr. 162).  Although the ALJ's finding that
plaintiff has a mild limitation in daily living activities
differs from Dr. Hameed's finding that plaintiff has <u>no</u>
restriction in his daily living activities (Tr. 140), it is

_____

[14]Although the ALJ states in his decision that Dr. Levitt
found no limitations in plaintiff's daily living activities (Tr.
17), Dr. Levitt in fact opined in his report that plaintiff had a
mild limitation in daily living activities (Tr. 178).

[15]As explained above, the ALJ must afford the opinion of a
treating physician special deference.  <u>See</u> 20 C.F.R.
§ 404.1527(d)(2); <u>Shaw v. Chater</u>, <u>supra</u>, 221 F.3d at 134; <u>Dias v.
Shalala</u>, <u>supra</u>, 59 F.3d at 313 n.6; <u>Schisler v. Sullivan</u>, <u>supra</u>,
3 F.3d at 567.

supported by substantial evidence, including the opinion of
plaintiff's treating physician.  In any event, the difference
between a finding of no limitation and a finding of mild
limitation does not affect whether plaintiff is disabled under
paragraph B.

The ALJ's finding that plaintiff has moderate
difficulties in social functioning is also supported by the
finding of Dr. Levitt (Tr. 179) and is consistent with other
evidence cited in the ALJ's decision (Tr. 17), namely Dr.
Lombard's report that plaintiff had some limitation in social
interaction (Tr. 155).  To the extent that the ALJ did not find a
more extreme limitation in social interaction, his finding on
this element is supported by Dr. Helprin's findings that
plaintiff's social skills and ability to relate to others were
adequate (Tr. 160, 162).  Although the ALJ did not mention this
in his opinion, his conclusion is also supported by Dr. Hameed's
findings that plaintiff had no significant limitations in his
abilities to "interact appropriately with the general
public[,] . . . get along with coworkers or peers without
distracting them or exhibiting behavioral extremes . . . [or]
maintain socially appropriate behavior" (Tr. 145).

In finding that plaintiff has moderate difficulties in
concentration, persistence or pace, the ALJ rejected the opinion
of Dr. Levitt, plaintiff's treating physician, that plaintiff has

a marked limitation in this area (Tr. 179; see Tr. 15-16).
However, the ALJ's conclusion was supported by other substantial
evidence in the record that was inconsistent with Dr. Levitt's
opinion:  Dr. Lombard's finding that plaintiff's depression
limited his concentration and persistence to an unspecified
degree (Tr. 155) and Dr. Helprin's statement that plaintiff was
"able to maintain sufficient attention and concentration [if]
provided [with] specific task instructions" (Tr. 161-62).  See 20
C.F.R. § 404.1527(d)(2) ("a treating source's opinion on the
issue(s) of the nature and severity of your impairment(s)" is to
be given controlling weight when it "is not inconsistent with the
other substantial evidence in [the] case record" and is supported
by mecially acceptable techniques).  Although the ALJ did not
cite this evidence in his opinion, his rejection of Dr. Levitt's
assessment is also supported by Dr. Helprin's conclusion that
plaintiff's attention and concentration are only mildly impaired
(Tr. 161) and Dr. Hameed's findings that plaintiff had moderate
difficulties in maintaining concentration, persistence or pace
(Tr. 140) and no significant limitations in his ability "to
perform at a consistent pace" (Tr. 145).

          Although the ALJ's failure to adopt the treating
physician's conclusion was supported by substantial evidence
inconsistent with that conclusion, see 20 C.F.R. §
404.1527(d)(2), the ALJ is still required to apply a series of

specific factors in order to determine what weight to give Dr.
Levitt's opinion.  These factors include:  (1) the length of the
treatment relationship and the frequency of examination; (2) the
nature and extent of the treatment relationship; (3) the medical
support for of the treating physician's opinion; (4) the
consistency of the opinion with the record as a whole; (5) the
physician's level of specialization in the area and (6) other
factors that tend to support or contradict the opinion.  20
C.F.R. § 404.1527(d)(2)-(6); <u>Schisler v. Sullivan</u>, <u>supra</u>, 3 F.3d
at 567; <u>Mitchell v. Astrue</u>, <u>supra</u>, 2009 WL 3096717 at *16;
<u>Matovic v. Chater</u>, <u>supra</u>, 1996 WL 11791 at *4.

         The ALJ's opinion contains no indication that he
considered any of these factors other than the fourth and perhaps
the sixth (<u>see</u> Tr. 17) in deciding not to give controlling weight
to Dr. Levitt's opinion on plaintiff's limitation in
concentration, persistence or pace.  Violation of the treating
physician rule can be a basis for remand.  <u>Halloran v. Barnhart</u>,
<u>supra</u>, 362 F.3d at 33 ("We do not hesitate to remand when the
Commissioner has not provided 'good reasons' for the weight given
to a treating physician[']s opinion and we will continue
remanding when we encounter opinions from ALJ[]s that do not
comprehensively set forth reasons for the weight assigned to a
treating physician's opinion."); <u>accord</u> <u>Rivas v. Barnhart</u>, <u>supra</u>,
2005 WL 183139 at *27.  In this case, however, the point on which

                                   39

the ALJ apparently contravened the treating physician rule is not dispositive; even if Dr. Levitt's conclusion that plaintiff had a marked limitation in concentration, persistence or pace were deemed controlling, plaintiff's condition would not qualify as a disability by satisfying the requirements of paragraph B because he does not have any other marked limitations and, as discussed below, has not experienced repeated episodes of decompensation.

The ALJ's conclusion that plaintiff had not experienced repeated episodes of decompensation is also consistent with substantial evidence.  Both Dr. Levitt and Dr. Hameed found that plaintiff had experienced only one or two episodes of decompensation or deterioration (Tr. 140, 179-80).  Beyond this, the record before the ALJ contained no evidence of any episodes of decompensation, defined as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(4).  Even if plaintiff's instances of extreme substance abuse, leading to his hospitalizations for detoxification and rehabilitation, were to be interpreted as episodes of decompensation, the evidence does not suggest that these events lasted at least two weeks each and happened three times within a year or an average of once every

40

four months, as the Commsissioner's regulations require.[16]  <u>See</u>
20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(4).

The ALJ's conclusion that plaintiff's condition failed
to meet the requirements of paragraph C is also supported by
substantial evidence.  As discussed above, there was no evidence
of repeated episodes of decompensation as defined in the Act.
Nor was there evidence that plaintiff experienced "a residual
disease process that has resulted in such marginal adjustment
that even a minimal increase in mental demands or a change in the
environment would be predicted to cause the individual to
decompensate."  20 C.F.R. pt. 404, subpt. P, app. 1,
§ 12.04(C)(2).  In fact, as the ALJ noted in his decision, Dr.
Helprin opined that plaintiff had the ability to "deal
appropriately with stressors with current treatment" (Tr. 162).
Further, there was no evidence in the record suggesting that
plaintiff had lacked the ability "to function outside a highly
supportive living environment" for more than a year (or for any
substantial length of time).  20 C.F.R. pt. 404, subpt. P, app.
1, § 12.04(C)(3).  The evidence regarding plaintiff's living
environment shows that he lives alone (Tr. 33-34) and that,
although he receives some assistance from his parents with

_____

[16]Furthermore, a finding of disability would be precluded if
the ALJ found that such episodes of decompensation would not have
occured but for plaintiff's use of drugs or alcohol, a conclusion
that would be nearly inevitable.  <u>See</u> 20 C.F.R. §§
404.1535(b)(1).

cleaning, cooking and grocery shopping, he is able to dress,
bathe and groom himself as well as drive himself to meetings (Tr.
161).

In determining plaintiff's RFC at step four, the ALJ
concluded that plaintiff has no exertional limitations, but has a
non-exertional limitation[17] which limits his work potential to
"simple, routine and repetitive tasks" (Tr. 16).  The ALJ
rejected plaintiff's contentions regarding his inability to work
at all, finding that his statements regarding "the intensity,
persistence and limiting effects of [his] symptoms [we]re not
credible to the extent they are inconsistent with the residual
functional capacity assessment"[18] (Tr. 16).

─────────────

[17]A non-exertional limitation is a limitation which affects
a claimant's ability to fulfill job functions that are unrelated
to strength.  20 C.F.R. § 404.1569a(c)(1).  Examples include
difficulty functioning because of depression and difficulty
maintaining attention or concentration.  20 C.F.R.
§ 404.1569a(c)(1)(i)-(ii).

[18]This conclusion is somewhat problematic, because
plaintiff's statements are one of the factors the ALJ is to
consider in making the RFC assessment.  20 C.F.R. §
404.1545(a)(3) (In determining your RFC, "[w]e will . . .
consider descriptions and observations of your limitations from
your impairment(s), including limitations that result from your
symptoms . . . provided by you . . . .").  Based on the context
-- a portion of the opinion in which the ALJ relies on other
evidence in the record to discredit plaintiff's contentions
regarding his ability to work -- I interpret the ALJ's statement
as an attempt to explain that the ALJ's RFC determination rejects
plaintiff's statements that his condition prevents him from
working because they are is inconsistent with other evidence in
the record.

The ALJ's RFC determination was supported by substantial evidence.  As the ALJ noted (Tr. 17), Dr. Levitt opined that plaintiff had only a mild limitation in his ability to perform simple tasks on a continued basis in a full-time work setting (Tr. 181) and Dr. Helprin opined that plaintiff was able to perform simple rote tasks (Tr. 161).  More generally, the ALJ emphasized that the only marked limitation Dr. Levitt found with regard to the paragraph B criteria was in the area of concentration and that Dr. Helprin found no significant limitations (Tr. 17, see Tr. 159-62, 178-81).  The ALJ's RFC determination is also consistent with Dr. Levitt's opinion that plaintiff had a marked limitation in his ability to perform complex tasks on a sustained basis in a full-time setting (Tr. 181) (emphasis added) and Dr. Helprin's recommendation that plaintiff seek a job involving "simple tasks with specific procedural instructions, not in a supervisory capacity" (Tr. 162).

To the extent the ALJ's RFC finding rested on a determination of plaintiff's credibility, it was "within the discretion of the [Commissioner] to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology." Gernavage v. Shalala, 882 F. Supp. 1413, 1419 (S.D.N.Y. 1995) (Leisure, D.J.); accord Mimms

43

v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984); Richardson v.
Astrue, 09 Civ. 1841 (SAS), 2009 WL 4793994 at *6 n.97 (S.D.N.Y.
Dec. 14, 2009) (Scheindlin, D.J.); see Aponte v. Sec'y, Dep't. of
Health & Human Servs. of U.S., 728 F.2d 588, 591 (2d Cir. 1984);
Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d
Cir. 1983) ("It is the function of the [Commissioner], not [the
reviewing courts], to resolve evidentiary conflicts and to
appraise the credibility of witnesses, including the claimant.").

        Concluding step four, the ALJ found, based on the
testimony of the vocational expert, that someone of plaintiff's
age, education, work history and RFC would not be able to do any
of his past relevant work,[19] which required the performance of
complex tasks (Tr. 18).  This determination was supported by
substantial evidence, as the vocational expert testified that the
job of construction project manager was skilled work and that
someone limited to the performance of simple, routine, repetitive
tasks would not be able to perform it (Tr. 39, 41).

        At step five, the ALJ relied on the Medical-Vocational
Guidelines[20] and the testimony of the vocational expert to find

---

        [19]A claimant's past relevant work is normally the work he or
she performed in the last fifteen years.  See 20 C.F.R. pt 404,
subpt P § 404.1565(a).

        [20]As discussed at page 29, above, where the claimant's
limitations are exclusively non-exertional, the Grid does not
direct specific conclusions of disabled or not disabled, but the
Commissioner uses the principles in the medical-vocational
                                                (continued...)

that plaintiff's RFC, combined with his age, education and work experience, allowed him to perform work other than his past relevant work -- namely, jobs such as garment sorter, industrial cleaner and kitchen helper (Tr. 18-19; <u>see</u> Tr. 41).  He also found, based directly on the expert's testimony, that these jobs exist in both the national economy and the relevant regional economy (Tr. 18-19; <u>see</u> Tr. 41).  Because the ALJ's finding directly reflects the only specific evidence on the subject of what other work, if any, plaintiff could perform given his RFC, age, education and work experience, it is supported by substantial evidence.

Accordingly, I conclude that the ALJ's determination that plaintiff was not disabled under the Social Security Act is supported by substantial evidence in the record that was before him.

        C.  The Possibility
            of Remand Due to
            <u>New Evidence</u>

Plaintiff submits new evidence that is not contained in the administrative record.  Because it was not before the ALJ, this evidence is not relevant to the question whether the ALJ's decision was supported by substantial evidence.  However, new

---

[20](...continued)
guidelines to inform his determination.  <u>See</u> 20 C.F.R. pt. 404, subpt. P, app. 2 § 200.00(e)(1); SSR 85-15.

evidence may sometimes provide a basis for the Court to remand the case to the ALJ.

> Pursuant to 42 U.S.C. § 405(g), a court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . ." To satisfy these requirements, plaintiff must show that: (1) the evidence is new and not merely cumulative of what is already in the record; (2) the evidence is material; and (3) good cause existed for his failure to present this evidence earlier. Lisa v. Secretary of Dept. of Health and Human Services[], 940 F.2d 40, 43 (2d Cir. 1991), quoting Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir. 1988). To be material, the evidence must be "both relevant to the claimant's condition during the time period for which benefits were denied, and probative." Id. ([emphasis added]). In addition, "[t]he concept of materiality requires . . . a reasonable possibility that the new evidence would have influenced the Secretary to decide claimant's application differently." Id. "'Good cause' for failing to present evidence in a prior proceeding exists where the evidence surfaces after the Commissioner's final decision and the claimant could not have obtained the evidence during the pendency of that proceeding." Lisa, 940 F.2d at 44.

Roman v. Barnhart, 477 F. Supp. 2d 587, 600 (S.D.N.Y. 2007) (Holwell, D.J.); accord Lisa v. Sec'y of Health & Human Servs., 940 F.2d 40, 43 (2d Cir. 1991); Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir. 1988). The fact that medical evidence did not exist until after the ALJ's decision does not necessarily make it irrelevant to the claimant's condition during the relevant time period; evidence of the nature of the condition after the relevant time period may bear on the severity of the condition

46

during the relevant time period.  See Pollard v. Halter, 377 F.3d 183, 193-94 (2d Cir. 2004); Lisa v. Sec'y of Dep't of Health & Human Servs., supra, 940 F.2d at 44.

          The first items plaintiff attaches to his affidavit in support of his motion are two documents, both entitled "Medical Examination for Employability Assessment, Disability Screening, and Alcoholism/Drug Addiction Determination," completed by Dr. Levitt and dated September 17, 2008 and March 11, 2009 respectively.  Much of the content in these two documents is cumulative information regarding plaintiff's conditions, diagnoses, hospital admissions, treatment and medications.  The March 11, 2009 examination report did provide new information regarding plaintiff's high cholesterol, but this is not relevant to plaintiff's disability claims, which are limited to mental impairments (Tr. 100, 102-03; see Tr. 34).  The March 11, 2009 report also reported that plaintiff was taking Fluoxetine and Ambien, neither of which had been noted anywhere in the administrative record.  However, the administrative record already establishes that plaintiff had tried numerous medications; the fact that plaintiff is now trying others does not bear on the severity of his condition during the relevant time period of November 30, 2005 through June 11, 2008.  See Pollard v. Halter, supra, 377 F.3d at 193-94.  Both reports also contain a set of Dr. Levitt's findings regarding plaintiff's

47

functional limitations.  The only findings that are not repetitive of evidence already in the administrative record are that plaintiff's ability to make simple decisions is moderately limited, that his ability to maintain socially appropriate behavior without exhibiting behavior extremes is moderately limited[21] and that his ability to maintain basic standards of personal hygiene and grooming is moderately limited.[22]  With regard to the latter two findings, the record contains evidence on the same subject matter that, while different from the new evidence, pertains to the relevant time period (Tr. 145, 161). Thus, the new evidence has little probative value concerning plaintiff's condition during the relevant time period.  In addition, even if the ALJ were to credit these findings, the only paragraph B or C criterion to which they relate is the limitation in social functioning, which the ALJ already found to be moderate in plaintiff (Tr. 15).  Accordingly, it is not reasonably likely that this new evidence would have caused the Commissioner to come to a different conclusion on the ultimate issue.  Nor is there a reasonable possibility that Dr. Levitt's finding of moderate limitation in simple decisionmaking ability would have caused the

---

[21]This differs from Dr. Hameed's finding that plaintiff had no significant limitation in his ability to get along with co-workers or peers without exhibiting behavioral extremes (Tr. 145).

[22]This is a departure from Dr. Helprin's finding that plaintiff was able to bathe and groom himself (Tr. 161).

Commissioner to find plaintiff disabled.  Even if the September
17, 2008 and March 11, 2009 findings had some bearing on
plaintiff's condition during the relevant time period, as <u>Pollard</u>
<u>v. Halter</u>, <u>supra</u>, 377 F.3d 183, contemplates, plaintiff's ability
to make simple decisions does not bear on the factors in either
paragraph B or paragraph C or on the RFC to perform work
involving "simple, routine and repetitive tasks," which, by their
nature, do not require significant decisionmaking.

        Dr. Levitt also opined in the September 17, 2008
examination report that "patient is unable to work now" and in
the March 11, 2009 examination report that "patient is unable to
work at this time."  These statements do not concern plaintiff's
ability to work during the relevant time period -- November 30,
2005 through June 11, 2008.  Notably, in the evaluation that <u>did</u>
cover the relevant time period, Dr. Levitt did not conclude
plaintiff was unable to work at all, but merely that he was
unable to perform his former work activity (Tr. 181).  Further,
because the determination of a claimant's ability to work is
within the purview of the Commissioner, statements in medical
evidence opining that a claimant cannot work are not entitled to
any particular deference.  20 C.F.R. § 404.1527(e)(1) ("We are
responsible for making the determination or decision about
whether you meet the statutory definition of disability. . . . A
statement by a medical source that you are 'disabled' or 'unable

to work' does not mean that we will determine that you are disabled."); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("[T]he ultimate finding of whether a claimant is disabled and cannot work [is] 'reserved to the Commissioner.'"); see Lisa v. Sec'y of Health & Human Servs., supra, 940 F.2d at 42.  Thus, there is no reasonable possibility that these statements would have changed the Commissioner's conclusion.

Second, plaintiff attaches to his affidavit in support of his motion a series of documents that relate to his physical health, primarily issues with his digestive system.  These include (1) an undated report of a physical exam conducted by Dr. David A. Brizer, which contains no substantive information as to plaintiff's mental health, (2) notes from several examinations of plaintiff's chest and abdomen conducted at Nyack Hospital in early July 2006, none of which contain any information regarding plaintiff's mental health, (3) medical history notes by George Liberis dated July 7, 2006 that are largely illegible but appear to state that plaintiff has a history of previous alcohol abuse, (4) a surgical pathology report and an operative report related to a gallbladder surgery ("laparoscopic cholecystectomy") on July 7, 2006 that resulted in a diagnosis of acute acalculous cholecystitis[23] and (5) several Nyack Hospital patient

---

[23]"Cholecystitis" is "inflammation of the gallbladder." Stedman's Medical Dictionary (27th ed. 2000).

information record sheets, dated July 10, 2006, July 31, 2006 and
August 17, 2006, respectively, which contain no substantive
information on plaintiff's physical or mental health.  To the
extent that any of these documents address the conditions that
are the subject of plaintiff's disability claim, which are
exclusively mental rather than physical (see Tr. 34, 100, 102-
03), they provide no detail beyond noting broad diagnoses and
contribute nothing new to the record.

        Also attached to his affidavit in support of his
motion, plaintiff submits various documents corresponding to his
admissions to Nyack Hospital Addiction Services on July 10, 2006
and August 2, 2006.  The documents relating to his admission on
July 10, 2006 are a psychosocial evaluation dated July 12, 2006[24]
and a discharge summary dated July 31, 2006.  The materials
relating to plaintiff's August 2, 2006 admission are a document
that appears to be an intake form, a psychosocial evaluation
dated August 2, 2006, a psychiatric evaluation by Dr. David
Brizer, dated August 7, 2006 and a discharge summary dated August
17, 2006.  To the extent that the new evidence regarding these
hospital admissions pertains to plaintiff's alleged disabilities,

---

        [24]The evaluation stated that plaintiff spends his free time
"working" and "going to meetings" -- but "working" was crossed
out with the word "error" written above it (7/12/06 Psychosocial
Evaluation at 5).

it is repetitive of evidence contained in the administrative record.

Also attached to plaintiff's affidavit in support of his motion is an undated form he completed for the Social Security Administration regarding his work background.  The form provides further information that was not in the record regarding plaintiff's work history, but contains no new information concerning the relevant fifteen-year period of work history. See 20 C.F.R. pt. 404, subpt. P § 404.1565(a).

Finally, plaintiff attaches to his affidavit in support of his motion the Social Security Administration form he completed regarding his medications.  This document differs from another version of the form which is contained in the official administrative record and only lists Effexor (Tr. 121).  The only new information it includes concerns medications plaintiff takes for his physical conditions, which are not relevant to the mental conditions that form the basis of his application for DIB.

Plaintiff also submitted various evidence with his "motion to amend the complaint," which is being treated as a supplement to his opposition to defendant's cross-motion.  First, he submits a letter from Dr. Levitt and Arlene Schwartz, LCSW, of Good Samaritan Hospital, to defendant's attorney, dated July 17,

2009.[25]  It states that plaintiff has been undergoing treatment
at Good Samaritan Hospital's Frawley Outpatient Mental Health
Clinic since October 29, 2007 for depression, anxiety and
obsessive compulsive disorder, that he "evidences disturbance of
mood, concentration [and] memory and has symptoms of confusion
and paranoia," and lists the medications he was taking as of the
time of the letter.  No symptoms of confusion or paranoia were
indicated in the administrative record (but Dr. Helprin did note
in April 2006 that plaintiff exhibited no evidence of paranoia
(Tr. 161)).  Although new evidence pertaining to a time outside
of the relevant time period can be probative, symptoms of
confusion and paranoia as of July 2009 do not "strongly
suggest[]," as the evidence in Pollard did, "that, during the
relevant time period, [plaintiff's] condition was far more
serious than previously thought and that additional impairments
existed when [plaintiff] was younger."  Pollard v. Halter, supra,
377 F.3d at 193.  Nor does the indication of symptoms and
paranoia constitute a "diagnosis emerg[ing] after the close of
administrative proceedings" that "'sheds considerable new light
on the seriousness of [a claimant's] condition.'"  Lisa v. Sec'y
of Dep't. of Health & Human Servs., supra, 940 F.2d at 44,
quoting Tolany v. Heckler, 756 F.2d 268, 272 (2d Cir. 1985)

---

[25]Plaintiff also sent me this letter separately, attached to
a cover letter which was dated August 13, 2009 and which stated
he was also serving the letter on the defendant by mail.

53

(remanding when new diagnosis suggested incontinence was due to a neurological defect rather than a purely urological problem). Neither plaintiff nor any of the medical evaluations pertaining to the relevant time period, some of which are quite thorough, suggested any sort of confusion or paranoia; this new evidence suggests only that plaintiff's condition may have worsened since the relevant time period concluded.  The letter also states that plaintiff's condition "negatively impact[s] his capacity to maintain or sustain employment and complete tasks in an effective and timely manner."  However, this statement is repetitive of Dr. Levitt's previous assessments contained in the administrative record and so cannot be considered new.

Plaintiff also submits a followup letter from Dr. Levitt, dated October 14, 2009 and "intended to amplify and correct" the July 17, 2009 letter.  The October 14, 2009 letter repeats the opinion that plaintiff's symptoms "severely and negatively impact his capacity to sustain or maintain employment or complete tasks in an effective and timely manner" and amends plaintiff's diagnosis to include PTSD, which was already noted in various documents that were part of the administrative record.

Plaintiff also attaches copies of his, his ex-wife's and his children's benefit cards for the September 11th Fund's Mental Health Benefit Program.  These cards shed no light on the severity of plaintiff's mental conditions or the type of work

54

which he was able to perform during the relevant time period;
thus, they are not probative.

Finally, plaintiff submits an "Attending Doctor's
Report" for the New York Workers' Compensation Board completed by
Dr. Harold H. Fogelman.  The report notes that plaintiff
witnessed the 9/11 attacks and indicated that his treatment
consisted of "medication management and psychotherapy."  It
stated that plaintiff was working, but that he was "total[ly]"
"disabled from regular duties."  Dr. Fogelman answered "Yes" to
the question "Can patient do any type of work?"  To the extent
this document may bear on the pertinent time period (it is dated
February 3, 2005), the information it contains is consistent with
the ALJ's decision, as Dr. Fogelman stated that plaintiff was in
fact working at the time and that he could perform some types of
work.  His finding that plaintiff had a total disability
regarding regular duties has no particular probative value
because it was made in the Workers' Compensation context.
"[F]indings of disability for workers' compensation purposes are
of limited utility for disability purposes under the Social
Security Act.  Those findings are geared to the person's prior
employment and allow findings of partial disability." DeJesus v.
Chater, 899 F. Supp. 1171, 1177 (S.D.N.Y. 1995) (Koeltl, D.J.);
see also Rosado v. Shalala, 868 F. Supp. 471, 473 (E.D.N.Y.
1994).  Thus, there is not a reasonable possibility that Dr.

Fogelman's report would have caused the Commissioner to conclude plaintiff was disabled.

Further, plaintiff has not demonstrated good cause for his failure to submit much of this evidence earlier.  Although plaintiff's late submission is justifiable with regard to the documents that did not exist before June 11, 2008, plaintiff offers no explanation for his failure to submit the other documents, which all predate June 11, 2008 or are undated, for inclusion in the administrative record to be considered by the Commissioner.

Thus, none of the new evidence plaintiff submits warrants a remand to the ALJ for further proceedings.

IV.  Conclusion

Accordingly, for all the foregoing reasons, I respectfully recommend that defendant's motion for judgment on the pleadings be granted, that plaintiff's motion for judgment on the pleadings be denied and that the complaint be dismissed.

V.  Objections

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from the date of this Report to file written objections.  See also Fed.R.Civ.P. 6(a).  Such objections (and

56

responses thereto) shall be filed with the Clerk of the Court,
with courtesy copies delivered to the chambers of the Honorable
Richard J. Sullivan, United States District Judge, 500 Pearl
Street, Room 640, New York, New York 10007, and to the chambers
of the undersigned, 500 Pearl Street, Room 750, New York, New
York 10007.  Any requests for an extension of time for filing
objections must be directed to Judge Sullivan.  FAILURE TO OBJECT
WITHIN FOURTEEN (14) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS
AND **WILL** PRECLUDE APPELLATE REVIEW.  Thomas v. Arn, 474 U.S. 140
(1985); United States v. Male Juvenile, 121 F.3d 34, 38 (2d Cir.
1997); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054
(2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.
1992); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir.
1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:  New York, New York
        March 25, 2010

                          Respectfully submitted,

                          _____
                          HENRY PITMAN
                          United States Magistrate Judge

Copies mailed to:

Mr. Leon Fortier, Sr.
244 North Liberty Drive
Tomkins Cove, New York 10986

Mr. Leon Fortier, Sr.
22 Stubbe Drive
Stony Point, New York 10980

John E. Gura, Jr., Esq.
Assistant United States Attorney
86 Chambers Street,
3rd Floor
New York, New York 10007